917 F.2d 1304
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
PLASTI-LINE MANUFACTURING COMPANY, Plaintiff-Appellant,
v.
COMBINED COMMUNICATIONS CORPORATION; Tencon, Inc.,
Defendants-Appellees.
 No. 89-6576.
 United States Court of Appeals, Sixth Circuit.
 Nov. 5, 1990.
 
 Before MERRITT, Chief Judge; and BOYCE F. MARTIN, Jr. and ALAN E. NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plasti-Line Manufacturing Co., a publicly-held Tennessee corporation, appeals the district court's determination that it suffered no damages in its purchase of a former competitor, Tencon, from Combined Communications Corp., a division of Gannet, Inc. Plasti-Line argues that it was harmed by a material misrepresentation as to Tencon's earnings stream because it did not get what it bargained for: a going concern with an increasing earnings trend. Plasti-Line further contends that its evidence regarding price/earnings ratio is sufficient to establish the damage resulting from this breach. We find that Plasti-Line is barred from asserting its claims because it did not fulfill the contractual provisions requiring prompt notification of any potential action.
 
 
 2
 Plasti-Line first attempted to purchase Tencon in 1985. After an extended and thorough "due diligence" investigation of Tencon's facility and operations, purchase negotiations broke down because the seller was inflexible about the sale price. In June of 1987, Combined again expressed an interest in selling Tencon to Plasti-Line. The new offer to sell contained very rigid terms: the sale price was set, and non-negotiable; Plasti-Line would not be permitted another "due diligence" investigation at the Tencon plant; Plasti-Line was not to contact any Tencon employees prior to the sale; they would furnish Plasti-Line with Tencon's financial statements following the execution of a confidentiality agreement; Plasti-Line would have to rely on these statements in making its purchasing decision and could not review Tencon's books or have them audited prior to the sale; the sale must be concluded quickly or the offer would be withdrawn. It was also agreed that, after the deal was effectuated, an outside auditor would audit the assets involved as of the date of closing and account for the approximately two additional months of Tencon's operation between the June 30th date on its financial statements and the closing date.
 
 
 3
 Despite the rigid terms, Plasti-Line desired to purchase Tencon to increase its production capacity and to gain a greater share of the outdoor sign market. A purchase price was set of just under $15 million, about $3 million over Tencon's book value, of which $2 million was to allocated to a covenant not to compete. Combined furnished to Plasti-Line Tencon's financial statements for 1985, 1986, and the projected numbers for 1987; the records indicated sales of $21.9 million in 1985, and $23.6 in 1986, with continued growth predicted for 1987. Plasti-Line remained sensitive to Tencon's earnings stream, because this income was needed to service the purchase debt. For this reason, Plasti-Line determined feasibility by compiling a "worst case" scenario projecting a flat, rather than increasing, stream of income. Following this study, Plasti-Line attempted to negotiate a lower purchase price. Combined rejected the revised offer, and Plasti-Line signed the Tencon Asset Sale Agreement on August 27, 1989 for the full purchase price.
 
 
 4
 After the agreement was signed, a purchase price audit was begun to determine final closing price adjustments. At this time that it was discovered that Tencon routinely carried over sales from one month to another in violation of Generally Accepted Accounting Principles. A massive carryover of sales from December 1985 to January 1986 resulted in a $2.15 million adjustment from 1986 back to 1985. As a consequence, the apparent trend of growing sales which Plasti-Line relied upon in making its purchasing decision was incorrect.
 
 
 5
 Although Plasti-Line was aware of the error in October 1987, it did not raise the issue before the final closing in December of the same year. Rather, after closing, Plasti-Line filed suit against Gannet alleging misrepresentation and breach of warranty by failing to comply with generally accepted accounting standards. The district court, in a non-jury trial, found the breach to be material, but disagreed with Plasti-Line's assertion that it had been damaged by Gannet's actions.
 
 
 6
 We agree with the judgment of the district court, but base our decision on different grounds. We find that, as a matter of law, Plasti-Line has waived the issue of material breach by failing to promptly notify Gannett once Plasti-Line learned of the misrepresented earnings figures. Paragraph 9.5 of the sales agreement requires prompt written notification of claims in order to facilitate compromise and prevent the "lie-in-wait" strategy employed by Plasti-Line. Plasti-Line's argument that Paragraph 9.1 gives either side a full year to raise any claims, is without merit as Paragraph 9.1 operates as a statute of limitations, confining contractual claims to a one year period, but remaining subject to the notice provisions of Paragraph 9.5.
 
 
 7
 Accordingly, Plasti-Line has waived its claim of material breach. The judgment of the district court is affirmed.